541 S.E.2d 822

**In the Matter of Terry A. TREXLER, Respondent.**

No. 25239.

Supreme Court of South Carolina.

Heard Dec. 6, 2000.
Decided Jan. 29, 2001.
Rehearing Denied March 7, 2001.

Court to review. The referee may consider this fact during the valuation proceeding.

Attorney General Charles M. Condon and Senior Assistant Attorney General James G. Bogle, Jr., both of Columbia, for the Office of Disciplinary Counsel.

Richard A. Blackmon, of Sumter, for respondent.

PER CURIAM:

This is an attorney disciplinary matter involving multiple uncontested charges of misconduct, including criminal conduct.[1]

1. *The Geneva Frances Matter*

Geneva Frances retained Respondent on August 22, 1996 to represent her regarding an automobile accident. The retainer agreement specified a one-third contingency fee. In addition, Respondent drew up a contract for expenses which provided, among other things, for research and investigation at the rate of $65.00 per hour and secretarial services at the rate of $10.00 per hour. This document was dated August 22, 1996. Respondent forged Ms. Frances's signature on the contract and notarized her forged signature.

Respondent settled Ms. Frances's case in March of 1997 for $30,000 and received a partial disbursement of settlement funds. Respondent immediately wrote himself a check for $15,000, claiming the extra $5,000 was for investigative services. An undated Disbursement Sheet showed funds for investigative services in the amount of $5,427.50. However, at the time of disbursement, no detailed itemization of the investigative work was presented to Ms. Frances. The undated Disbursement Sheet showed only "legal assistant expense, 83.5 hours—$65.00 per hour." The Disbursement Sheet also included a charge of $536.50 for paper, fax, stamps, copies, gasoline and mileage, phone, electricity, *and* the investigator's expense to review the accident scene. These bills were improper because Respondent's fee was based on a contingency

---

1. Respondent was convicted on August 4, 2000 of breach of trust with fraudulent intent, blackmail, and conspiracy.

agreement. A copy of this document was not given to Ms. Frances at the time of disbursement. Respondent disbursed only $3,195.60 to Ms. Frances, and no disbursement was made to medical providers at that time. When Ms. Frances met with an attorney from the South Carolina Bar's Fee Dispute Resolution Board, she saw for the first time a document bearing her forged signature, stating that she "received and approved" the personal injury disbursement from her case on March 26, 1997.

Toumey Hospital treated Ms. Frances for her injuries related to the automobile accident. Ms. Frances's medical expenses totaled $9,430.54. Respondent did not pay Toumey out of the settlement. A collection agency contacted Ms. Frances concerning her unpaid bill at Toumey. Ms. Frances contacted Respondent's office, requesting information and a copy of her file. Respondent provided Ms. Frances with a copy of her file, but tried to charge her $91.25 for the copy, including one hour's work at $65.00 per hour, as opposed to the $10.00 per hour fee for secretarial service set forth in the Settlement Costs and Expenses Agreement. Respondent eventually paid Ms. Frances's medical bills on May 15, 1997. During the time of delay, Respondent allowed the balance of his trust account to drop as low as $6,326.60 during two months. Payment of Ms. Frances's medical bills was therefore made with funds owed to other clients.

During the course of representation, Respondent advanced $1,000 and $100 to Ms. Frances. These advances were made from funds owed to other clients. Respondent later claimed these advances were to pay specified medical bills in even amounts of $1,000 and $100, even though no such bills existed.

Respondent claimed to have employed Robert Moore as an investigator regarding the Geneva Frances matter. Mr. Moore had no prior investigative experience and no experience researching medical matters. Mr. Moore stated he made approximately 407 copies of documents at the Medical University of South Carolina regarding hand injuries. Mr. Moore testified he made a hand-written summary of his investigation, but no copy was located and no correspondence from Respondent to Ms. Frances's insurance carrier or physician reflects any such research. Mr. Moore's cellular telephone records,

for at least one of the days he claimed to be in Charleston doing research, showed calls attributable to a cell tower that did not serve the Charleston area. Respondent falsely testified before the Commission on Lawyer Conduct that the documents supposedly obtained by Mr. Moore were used to enhance his position when negotiating Ms. Frances's case.

Mr. Moore did not prepare itemized bills for his time and expenses on the Geneva Frances case. Respondent and Mr. Moore both testified at their Notices of Appearance that Respondent paid Mr. Moore over $5,000 in cash for his services. Mr. Moore testified he maintains no checking or savings account and did not deposit the money, but simply used it over the course of time.

Ms. Frances complained to Respondent about the disbursement of funds, payment owed to medical providers, and investigator's fee. In response, Respondent wrote a letter to Ms. Frances dated June 13, 1997, stating that if she complained to the South Carolina Bar and others, he would sue her for $500,000 for slander *per se* and intentional infliction of emotional distress. In a letter to Ms. Frances dated June 14, 1997, Respondent threatened to have her arrested and have criminal charges brought against her, in addition to the civil actions for slander and intentional infliction of emotional distress, "the next time you do anything in relation to contacting my office or anyone else. . . ."

Respondent swore under oath at his Notice of Appearance that he saw Ms. Frances sign the August 22, 1996 contract and the March 26, 1997 approval of disbursement. Investigators from the Attorney General's office found the Settlement Cost and Expense Agreement authorizing the hiring of an investigator, the undated Disbursement Sheet, the approval of the disbursement, and Ms. Frances's letter of complaint to the Fee Dispute Board in the trunk of Respondent's car. Among these documents was a letter dated July 21, 1997 with a simulation of Ms. Frances's signature on the reverse side. Respondent admitted making that signature at his Appearance. Further examination revealed that there had been a tracing done over "Geneva" in Ms. Frances's signature on a copy of the original fee agreement of August 22, 1996. The Questioned Documents section of the State Law Enforcement

Division confirmed that Ms. Frances's signature, taken from a copy of the original fee agreement, was traced or forged on the March 26, 1997 document approving the settlement of Ms. Frances's case and the August 22, 1996 contract approving the hiring of an investigator. Respondent not only committed forgery, he notarized the forgeries, and lied about them under oath at his Appearance.

### 2. *The James Richard Bryant Matter*

Respondent conducted a real estate closing for James Richard Bryant on October 23, 1997. Respondent neglected this matter, not recording the deed or paying the survey fee until February of 1998. During the period between Respondent's receipt of closing funds and payment of the survey fee, Respondent allowed his trust account to reach a negative balance.

### 3. *The Arthur H. Wilder, Jr. Matter*

Arthur H. Wilder, Jr., the Solicitor for the Third Judicial Circuit, was prosecuting Dean McElveen for rape, kidnapping, and buggery, in a case where the alleged victim was McElveen's former wife, Robin McElveen. Attorney John Miles represented Dean McElveen. Mr. McElveen had brought contempt charges against Mrs. McElveen in the family court. She was found in contempt and sentenced to pay $500 or serve ninety days in jail. Respondent telephoned Mr. Miles and told Mr. Miles that he was representing Mrs. McElveen. Respondent stated that the criminal charges against Mr. McElveen would be dropped in exchange for Mr. McElveen dropping the family court contempt charges and paying Mrs. McElveen $10,000 in cash. Mr. Miles requested this demand in writing. When he did not receive anything in writing, Mr. Miles eventually went to Respondent's office and asked if he could prepare an affidavit memorializing their telephone conversation. Respondent agreed and he and Mr. Miles both signed the resulting affidavit, which attested to the content of the telephone conversation described above, and notarized each other's signatures. At the subsequent family court hearing, Mrs. McElveen appeared represented by an attorney other than Respondent. She testified at the hearing that Respondent was not her lawyer, she did not want money, and she

never authorized Respondent to call Mr. Miles. Respondent failed to respond to the subsequent inquiries and investigation by the Commission on Lawyer Conduct.

### 4. *The Annette Briggs Matter*

Annette Briggs hired Respondent in December of 1996 to represent her concerning a probate court matter. Opposing counsel was John C. Land, III. Mr. Land represented Respondent in a disciplinary matter. Ms. Briggs first learned that Mr. Land was representing Respondent when she read a public reprimand issued to Respondent on September 22, 1997. At no time did Respondent disclose to Ms. Briggs that opposing counsel represented him in another matter. Further, Respondent failed to respond to the subsequent inquiries and investigation into this matter.

### 5. *The Second James Richard Bryant Matter*

Respondent made payments out of his escrow account on behalf of one client from funds deposited into that account on behalf of another client or personal funds deposited by himself. On January 6, 1998, Respondent wrote a check from his escrow account to Les Boles, marked "closing," in the amount of $1,121.36. On the same day, Respondent wrote a check from his escrow account to Mark McCoy and Beckie McCoy for settlement of a personal injury case in the amount of $2,331. The balance the day before, January 5, was $2,076.04. The balance on January 7 was $76.04, due to a $2,000 check being written. On January 8, Respondent deposited personal funds, drawn upon a personal account shared by Respondent and his mother, in the amount of $3,700, less $1,539 cash, for a net deposit of $2,161. This brought the balance in the escrow account to $2,237.04 as of January 8, 1998. On January 9, 1998, the checks to Mr. Boles and the McCoys were posted and returned due to insufficient funds. The posting of these two checks, plus return fees of $23.00 each, brought the balance to—$1,261.32 on January 9, 1998. On January 12, 1998, Respondent deposited $6,000, causing the checks to Mr. Boles and the McCoys to clear and restoring a positive balance. The source of the $6,000 was a settlement consisting of six checks arising from a personal injury case payable to Mark McCoy and Becky Hogue. Thus, Respondent used the

McCoy/Hogue money to pay both the McCoy/Hogue claims and the Boles closing. In addition or in the alternative, Respondent used his own funds to pay these claims. Respondent failed to respond to subsequent inquiries and investigation into this matter.

### 6. *The Disciplinary Counsel Matter*

April Pearson was a foster child living with Sara and Theodis Coulter in Sumter. She is disabled, with a low I.Q. and classified as educable retarded. Lexington County Department of Social Services supervised April Pearson. In 1984, when April was about thirteen years old, she became entitled to $20,882.61 in back payments from the Social Security Administration as a result of a class action lawsuit. Following the directives of her supervisor, Amber McMillan, a social worker with Lexington County DSS, contacted the Coulters for the name of an attorney to establish a trust or similar savings fund in which to deposit this money. The Coulters had used Respondent on two prior occasions, so they recommended him to Ms. McMillan. Ms. McMillan met with Respondent and he prepared a trust document on January 21, 1994, appointing himself Trustee.

The trust document was executed by Ms. McMillan and witnessed by two individuals. In Article II, Respondent was appointed Trustee. In Article IV, the trust principal was identified as the $20,882.61. Article V of the trust relieved the Trustee from the provisions of the "Uniform Trustee's Accounting Act" and other such restrictive legislation which may be in effect. The Uniform Trust Act had not been enacted in South Carolina. The "Uniform Trustee's Accounting Act" did not exist.

Article VI of the trust provided that the Trustee could pay himself from the trust such compensation as was usual and reasonable, and may pay attorney's fees or other expenses incurred. Other than Article VI of the trust, there was no fee agreement between Respondent and the Coulters, Ms. McMillan, Lexington County DSS, or South Carolina DSS.

Lexington County DSS issued a check for $20,882.61 on February 1, 1994 to "Drexler [sic] Law Firm" to establish the April Pearson trust account. Respondent deposited the check

into his escrow account and opened a mutual fund on behalf of April Pearson with Washington Mutual Investors Fund in the name of "Terry A. Trexler, Trustee, April Pearson Trust, DTD 1/31/94." Respondent only deposited $15,000 of the April Pearson money into the trust when he opened it and misappropriated the remaining $5,882.61.

Without notice to or knowledge of the Coulters, Amber McMillan, or Lexington County or South Carolina DSS, Respondent made a telephone redemption of $5,000 from the mutual fund on February 1, 1995 and deposited the money into his escrow account. Respondent then misappropriated this money, loaning it to a private investigator, Robert Lee Moore.

On July 25, 1995, Respondent wrote himself a check for $285 from his escrow account labeled "April Pearson" as a fee. This was done without notice to or knowledge of the Coulters, Amber McMillan, or Lexington County or South Carolina DSS. If it was a fee, Respondent provided no bill, invoice, or statement.

Respondent unilaterally executed a loan agreement, stating that he would borrow $9,510 from the April Pearson Trust on July 7, 1995 and July 20, 1995. The document went on to provide that a lump sum payment of $13,000 would be paid back to the trust "during the year 1998." Respondent then withdrew $6,510 on July 7, 1995 and $3,000 on July 20, 1995 from the trust account, deposited the funds into his escrow account, and subsequently spent the money. Respondent did not: (1) enter into a transaction with his client with terms of interest set forth therein, (2) enter into a transaction with his client with terms that were reasonable and fair to his client, (3) enter into a transaction with his client with terms that were fully disclosed and transmitted in writing to the client in a manner that could be reasonably understood by the client, (4) give the client a reasonable opportunity to seek the advice of independent counsel in the transaction, or (5) require the client to consent in writing to the transaction.

Despite April's mental disability, Respondent did not maintain a normal lawyer-client relationship with her. He did not seek the appointment of a guardian or take other protective action with respect to her regarding the management of the

trust, and specifically the taking of the $9,510 loan and the $5,000 loaned to the private investigator.

Although the trust was intended primarily for April's future, it was understood that the Coulters could withdraw money from the trust for the benefit of April. On November 17, 1994, the Coulters received $1,777.81 from the trust to purchase a computer for April. The Coulters also received from Respondent $580 in July 1995 to purchase bedroom furniture for April and $1,000 in July 1997 for a vacation ($500) and a fee to adopt April ($450). The adoption did not take place. In addition, when Mr. Coulter was out of work due to an on-the-job injury, the family requested, and received from Respondent, $1,500 to apply toward family bills. The checks for $580, $1,000, and $1,500 were not withdrawn from April's trust account, but were taken from Respondent's personal funds or law firm funds.

When the investigation into the April Pearson trust began, in September of 1998, the balance in the trust's mutual fund was only $790.59. After Respondent learned about the investigation, he paid $13,000 back into the trust on October 1, 1998. The $13,000 check was drawn on a personal account maintained by Respondent and his mother. Washington Mutual Investors calculated that if Respondent had simply deposited the initial $15,000 on May 11, 1994 and taken no withdrawals from that sum, the value of the fund on October 1, 1998 would have been $34,471.99. In the alternative, if Respondent had deposited the entire $20,882.61, taken the withdrawals described above, and deposited the $13,000 on October 1, 1998, the value of the fund on October 1, 1998 would have been $22,885.25. As an additional alternative, if Respondent had deposited the full $20,882.61 on May 11, 1994, together with the deposit of $13,000 on October 1, 1998, and deducted the withdrawals of his loan and the sums paid to the Coulters, the balance as of October 1, 1998 would have been $34,057.78. The actual balance on October 1, 1998, after the $13,000 deposit, was $13,105.34.

Respondent did not respond to the subsequent inquiries and investigation into this matter.

## 7. *The Fike Matter*

Respondent was retained to represent Fike in a civil action against a residential builder and its owners for a fee of about $3,300. After a length of time with minimal action, Respondent failed to respond to Fike's repeated requests for information regarding the case. Fike gave Respondent specific directions as to strategy and decisions about the action, which Respondent refused to follow. Respondent initially misled Fike about the overall conditions and timing of the action, resulting in personal hardship to Fike. Respondent lacked the requisite legal competence to pursue the action for which Fike hired him. Respondent delayed Fike's legal action through his deliberate refusal to respond to discovery requests. Respondent failed to respond to opposing counsel, even though documents required for the discovery process were provided to Respondent and were in his possession. Respondent failed to provide an accounting to Fike for the use of the fees received and the performance of legal services. Respondent failed to provide Fike any information regarding his practice and availability to continue the action on Fike's behalf. Respondent was placed on interim suspension on October 2, 1998. Thereafter, he failed to comply with this Court's directives and did not adequately protect Fike's interests. Fike filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

## 8. *The Brown Matter*

Brown retained Respondent to handle a domestic matter and paid Respondent a $750 fee. Respondent failed to act with diligence and did not communicate with his client about the action. Respondent gave erroneous advice to Brown and made misrepresentations about Brown's rights. Brown filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

## 9. *The Callen Matter*

Callen retained Respondent on a child visitation matter and paid Respondent a $1,000 fee. Respondent failed to act with

diligence and did not perform the contracted legal services for his client. Respondent failed to communicate with his client in a timely fashion about this action. Respondent made misrepresentations about both the services performed and the charges being assessed against Callen's retainer. Callen filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 10. *The Berry Matter*

Berry retained Respondent in a domestic matter. Berry filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 11. *The Huff Matter*

Huff retained Respondent in a domestic matter. Huff filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 12. *The Ervin Matter*

Ervin retained Respondent regarding a divorce. Respondent accepted a $550 fee but performed virtually no legal services for Ervin. Respondent advised Ervin the action could be completed within sixty days, when he had reason to know the statement was false, for reasons including the fact that the opposing party would have to be served by publication. The client file has since been returned to Ervin, but Respondent has made no accounting as to how the fee was earned.

Respondent was suspended from the practice of law on October 2, 1998, and thereafter became inaccessible to his client. Ervin made many unsuccessful attempts to contact Respondent about her options for alternative representation and retrieval of her file. Respondent's mother directed Ervin to another attorney, who had already received Ervin's file, but without Ervin's permission and without any consultation to seek Ervin's approval prior to the transfer of her file. Ervin filed a letter of complaint with the Commission on Lawyer

Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 13. *The Yates Matter*

Yates retained Respondent in a domestic matter and paid Respondent a fee of approximately $650. Respondent failed to perform adequate legal services, failed to act diligently, and did not communicate with his client. Yates filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 14. *The Wilson Matter*

Wilson retained Respondent to seek Social Security benefits and paid Respondent a fee of approximately $500. Respondent failed to act with diligence, did not respond to Wilson's inquiries, and performed inadequate legal services in relation to the legal fee charged. Wilson filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 15. *The Collins Matter*

Collins retained Respondent for a family court matter and paid Respondent a fee of approximately $1,100. Respondent was placed on interim suspension while the matter was pending, but did not provide notice of his suspension to his client. Collins attempted to contact Respondent about the family court matter, and finally received a reply from Respondent's mother. Respondent either directed or caused the transfer of Collins's file to another attorney, without Collins's knowledge, consultation, or permission. Collins filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 16. *The Neubert Matter*

Neubert retained Respondent to file suit against a bank, among other matters. Respondent failed to file the suit in a timely manner, causing Neubert's action to be barred by the statute of limitations. Neubert filed a letter of complaint with

the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 17. *The Johnson Matter*

Johnson retained Respondent to file a child custody action on Johnson's behalf. Johnson filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 18. *The Harris Matter*

Harris retained Respondent in a domestic matter and paid Respondent fees of approximately $1,500. Harris filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 19. *The Stewart Matter*

Stewart retained Respondent in a family court matter and paid Respondent fees of approximately $750 plus costs of $130. Stewart filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 20. *The Bryant Matter*

Rosa Bryant retained Respondent to get a court date for her and her husband in a grandparent visitation matter and paid Respondent a legal fee. No court date was ever provided. After approximately three months, Respondent summoned the Bryants to his office and told them he had filed a lawsuit on their behalf. Mrs. Bryant told Respondent that was not what they had hired him to do. Mrs. Bryant later learned that Respondent had copied another attorney's work, hired by Mrs. Bryant's son. Respondent never appeared in court at any time on the Bryants' behalf. Respondent never made any refund or accounting to the Bryants as to how he applied their attorney's fees. Bryant filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 21. *The Solesbee Matter*

Solesbee retained Respondent in a domestic matter and paid Respondent fees of approximately $1,000. Approximately three months after being retained, Respondent notified Solesbee that another attorney had been associated on the case. Respondent did not consult with, nor request approval from his client prior to this association, nor did Respondent have Solesbee's permission to engage another attorney.

Respondent was unable to timely obtain a hearing on Solesbee's behalf. Respondent, through his staff, told Solesbee that the reason for delay was difficulty in serving the pleadings on Solesbee's spouse. Respondent attended a hearing on this matter, and at the hearing, improperly prompted Solesbee on the witness stand to agree to certain matters concerning marital debt to which Solesbee had not originally agreed.

As the one-year mark approached for a final hearing, Respondent represented to Solesbee that a hearing had been scheduled. Before the purportedly scheduled hearing, Respondent was arrested for a criminal violation and placed on interim suspension. Prior to his suspension, Respondent had never requested a hearing on Solesbee's behalf. Respondent failed to file the parties' agreement with the court and took no action to have the agreement approved by the family court. Solesbee was forced to obtain other legal counsel to obtain a divorce. Respondent did not respond to inquiries from Solesbee and provided little representation to his client. Following the interim suspension, Respondent did not properly notify Solesbee. Solesbee filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

### 22. *The Smith Matter*

Smith retained Respondent to pursue an action for grandparent visitation rights. Respondent explained to Smith that he required payment of approximately $2,000 for fees and an additional $500 to hire a detective. Respondent failed to hire a private detective and failed to respond to Smith's inquiries regarding the private detective's report. Instead, Respondent misappropriated the money to his own personal use.

Respondent failed to provide any substantial legal services to Smith in return for the fees he collected, and failed upon request to provide an itemized bill for legal services rendered.

There was at least one family court hearing scheduled. Respondent did not contact Smith to prepare for this hearing. Respondent failed to respond to Smith's inquiries concerning the matter for which he had been retained. Smith filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

23. *The Wroble Matter*

Wroble, who lived out of state, retained Respondent in a divorce and custody matter and paid Respondent fees of approximately $3,500, plus an additional $500 to hire a private investigator. After a period of months, Wroble asked Respondent for a report on the investigator's findings. Respondent failed to adequately answer his client's inquires, instead providing vague answers, such as that Wroble's "husband was slick ..." Respondent contacted Wroble to explain that there had been a hearing in the matter, that Respondent had been present at the hearing and represented Wroble. Respondent did not notify Wroble of the hearing in advance. As a result of Respondent's lack of diligence, Wroble did not receive the family court's order directing her to pay child support until she was already in violation of the order.

During the course of representation, Respondent failed to obtain available evidence of prior criminal domestic violence by Wroble's spouse or of Wroble's spouse's adulterous relationship, committed in the presence of Wroble's children. Respondent failed to prepare adequately for trial and used coercive tactics to have Wroble sign an agreement for joint custody of the children. Respondent failed to adequately protect his client's interests in this agreement.

Respondent failed to respond to Wroble's request for an itemized bill. Wroble filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

## 24. *The Shirah Matter*

Shirah retained Respondent to represent her in a divorce case and paid Respondent fees of approximately $1,300 and costs of approximately $125. Respondent first notified Shirah about a hearing only a few days prior to its scheduled date. Respondent met with Shirah the morning of the hearing, but then had the hearing continued. Shirah's spouse requested a second hearing, and Respondent did not notify his client. Respondent explained to his client that there had been no hearing on that date, and the hearing was in fact scheduled for later in the month. Prior to the hearing date, Respondent was arrested and placed on interim suspension. Shirah learned of Respondent's arrest through newspaper accounts and attempted without success to find out about her case by multiple telephone calls to Respondent's family and to the family court. Shirah learned from the family court that Respondent had never scheduled a hearing, as he had previously represented to her. Shirah learned from her spouse that Respondent had attended a hearing without notifying her. Respondent failed to provide a copy of the order arising from that hearing to his client. Respondent failed to notify Shirah that the family court had directed her to pay child support; instead, Shirah learned this from her husband. Respondent failed to notify Shirah that he was placed on interim suspension. Respondent's mother tried to refer Shirah to another attorney, even setting up an appointment with that attorney, without knowledge or permission from Shirah. Shirah's file was provided to that other attorney without Shirah's permission. Shirah filed a letter of complaint with the Commission on Lawyer Conduct and Respondent failed to respond to the subsequent inquiries and investigation.

## *The Panel's Findings* [2]

Regarding all matters, the panel found violations of Rules 7(a) of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: (1) violating a Rule of Professional Conduct; (3) willful failure to appear personally for a Notice to Appear as directed under Rule 19(c)(4), willful failure to comply with the subpoena issued under Rule 413, and failure to respond to a lawful demand from a disciplinary authority; (5) engaging in

---

2. The full panel adopted the report of the subpanel.

conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law; and (6) violating the oath of office taken upon admission to practice law in this state.

From the Rules of Professional Conduct, Rule 407, SCACR, the panel found with regard to all matters violations of Rule 8.4, misconduct, subsections (a), (b), (c), (d), and (e). For all matters, the panel found a failure to act competently (Rule 1.1), failure to act with reasonable diligence and promptness in representing a client (Rule 1.3), failure to keep a client reasonably informed about the status of the matter and comply promptly with reasonable requests for information (Rule 1.4), and charging an unreasonable fee or a fee inconsistent with a previous agreement for the fee (Rule 1.5(a) and (b)).

Specifically regarding the Geneva Frances matter, the panel found Respondent misappropriated his client's funds to his own use, failed to deliver to his client funds she was entitled to receive, and failed to promptly render a full accounting regarding property (Rule 1.15). Moreover, Respondent was untruthful in statements to others (Rule 4.1), threatened criminal prosecution (Rule 4.5), did not act with candor toward a tribunal, the Commission on Lawyer Conduct (Rule 3.4), and failed to respond to a lawful demand for information from a disciplinary authority, as well as misleading a disciplinary authority (Rule 8.1(b)). Further, by his forgeries, Respondent committed felonies in violation of the criminal laws of South Carolina, a violation of Rule 8.4.

The panel found violations of Rule 1.1, 1.3, 1.5, 1.15, and 8.4 with regard to the James Richard Bryant matter, the Arthur H. Wilder, Jr. matter, the Annette Briggs matter, the second James Richard Bryant matter, the Disciplinary Counsel matter, the Fike matter, the Brown matter, the Callen matter, the Berry matter, the Huff matter, the Ervin matter, the Yates matter, the Wilson matter, the Collins matter, the Neubert matter, the Johnson matter, the Stewart matter, the Bryant matter, the Solesbee matter, the Smith matter, the Wroble matter, and the Shirah matter. In addition, the panel found Respondent at the very least attempted to obstruct justice, in violation of the criminal law of this state, and in violation of

Rule 8.4 in the Arthur H. Wilder, Jr. matter, a violation of Rule 1.15 with regard to the misappropriation of funds due April Pearson in the Disciplinary Counsel matter, and a violation of Rule 4.1, truthfulness in statements to others, in the Shirah matter. The panel also found repeated failure to respond to demands from disciplinary authority in violation of Rule 8.1(b).

We concur with the panel's findings. We have deemed disbarment the appropriate sanction in similar cases involving multiple acts of misconduct, including criminal violations. *See, e.g., In re Courtney,* 342 S.C. 617, 538 S.E.2d 652 (2000); *In re Gibbes,* 323 S.C. 80, 450 S.E.2d 588 (1994).

Respondent is disbarred, effective as of the date of this Opinion. We also order Respondent to make restitution to all injured parties, including clients, organizations, and the Lawyers' Fund for Client Protection and to pay the costs of all these proceedings. The Office of Disciplinary Counsel shall determine the amount of restitution, with due consideration to the Circuit Court's findings at Respondent's restitution hearing, and implement a plan for restitution. Within fifteen days of the date of this opinion, Respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DISBARRED.**